13
Jenna Dakroub, CA #350170
**CONSUMER ATTORNEYS**
8245 N. 85th Way
Scottsdale, AZ 85258
T: (602) 807-1525
F: (480) 613-7733
E: jdakroub@consumerjustice.com

*Attorneys for Debtor Joshua Scott Miller*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
MODESTO DIVISION**

| | |
|---|---|
| In re:<br><br>JOSHUA SCOTT MILLER<br><br>            Debtor, | Case No.: 23-90171-E<br>Docket Control: CJL-2<br><br>Chapter 7<br><br>**MOTION FOR CONTEMPT AND DAMAGES FOR VIOLATION OF THE AUTOMATIC STAY**<br><br>Date: May 1, 2025<br>Time: 10:30 am. PST<br>Courtroom: Modesto Division 1200 I Street, Suite 200, Modesto, California<br><br>Hon. Ronald H. Sargis |

<u>**MOTION FOR CONTEMPT AND DAMAGES FOR VIOLATION
OF THE AUTOMATIC STAY**</u>

Debtor, Joshua Scott Miller, ("Debtor") seeks redress for the unlawful and intentional practices committed by Lafayette Federal Credit Union ("Lafayette") in connection with their actions taken in violation of the Automatic Stay. Debtor seeks monetary relief pursuant to 11 U.S.C. § 362, and damages, both compensatory and punitive, plus all reasonable attorneys' fees

and costs incurred in bringing this action, sanctions, and such other relief the Court deems appropriate. In support of this Motion, Debtor alleges as follows:

The Petition seeking relief under Chapter 7 of Title 11 of the United States Bankruptcy Code was filed on April 20, 2023. The case was re-opened by order of this Court on March 19, 2025, order [Doc. 31].

After Debtor filed his Chapter 7 petition and while the automatic stay was in place, Lafayette filed a UCC-1 Financing Statement ("File No. 2023-003115") (the "Financing Statement") in order to perfect Lafayette's security interest in Debtor's inground pool at his residence (the "Property").

Lafayette's action in filing the Financing Statement caused Debtor to lose out on profits from the sale of the Property, as potential buyers who had made offers backed out upon discovering the existence of the Financing Statement. While Debtor eventually did sell the Property after the lien was removed, he was forced to accept an offer considerably less than those he received from potential buyers prior to the discovery of the existence of the lien. Furthermore, the unjustifiable delay in providing Debtor with confirmation that the lien on the Property had been terminated and in providing Debtor with a copy of the termination filing caused Debtor to suffer similar financial harm and emotional distress damages, as he could not prove to potential buyers that the Financing Statement was void and would soon be terminated. These damages are recoverable pursuant to Title 11 of the United States Code section 362(k)(1).

**JURISDICTION AND VENUE**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157 because this matter relates to this Court's power

to enforce the Stay imposed in this case under 11 U.S.C. § 362. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**STATEMENT OF GROUNDS**

In or around February 2021, Debtor applied for, and received, a personal loan from Lafayette. As collateral, Lafayette obtained a security interest in an inground pool at Debtor's residence in Valley Springs, California (the "Property"). A copy of the loan agreement between Debtor and Lafayette is attached hereto as Exhibit 3.

Having fallen on hard financial times, on or about April 20, 2023, Debtor filed for Chapter 7 Bankruptcy. Lafayette was listed as a creditor in Schedules E/F of Debtor's Chapter 7 bankruptcy petition and was included on the Master Creditor Matrix. A copy of Debtor's Chapter 7 bankruptcy petition is attached hereto as Exhibit 4.

On or about April 26, 2023, the Bankruptcy Noticing Center ("BNC") mailed notice of Debtor's bankruptcy petition, and the resultant Automatic Stay, to Lafayette, at the business address for the Rockville, MD Lafayette branch location. A copy of the BNC Certificate of Notice is attached hereto as Exhibit 5.

Unbeknownst to Debtor, on or about May 1, 2023, Lafayette, through their counsel Silverman Theologou, LLP ("ST"), filed a UCC-1 Financing Statement ("File No. 2023-003115) (the "Financing Statement") in an attempt to perfect Lafayette's security interest in the Property. A copy of the Financing Statement is attached hereto as Exhibit 6.

Thereafter, on or about July 24, 2023, Debtor received a Chapter 7 bankruptcy discharge, and the bankruptcy case was closed on or about November 3, 2023. A copy of Debtor's Chapter 7 Discharge Order is attached hereto as Exhibit 7.

In or around November 2023, around Thanksgiving, Debtor and Debtor's husband decided to relocate their family from California to the east coast, in order to be closer to relatives living in Tennessee and Georgia. Debtor and his family were highly motivated to relocate to the east coast, as Debtor wished for his young son to meet his great grandfather, who was ninety-one years of age and in ailing health, for the first time. *See* Declaration of Debtor, attached hereto as Exhibit 1, at ¶ 5. As Debtor's bankruptcy case had just recently closed, Debtor, on or about November 27, 2023, emailed his bankruptcy attorneys at Resolve Law Group ("Resolve") and asked if there were any restrictions on selling the Property due to the bankruptcy case, or if Debtor was free to sell the Property and move to the east coast. *Id.,* at ¶ 6. Resolve responded to Debtor, accurately informing him that he was free to sell the Property at any time he wished, given that the bankruptcy case was closed. *Id.,* at ¶ 7.

Consequently, in January, 2024, Debtor listed the Property for sale. *Id.,* at ¶ 8. Because Debtor's husband, Steven Adler ("Mr. Adler"), is a licensed real estate agent, Debtor and Debtor's husband listed the Property for sale themselves, without utilizing outside real estate agent services. *Id.,* at ¶ 9. Almost immediately after the Property was listed, Debtor began to receive strong interest from potential buyers, who were willing to pay asking price, and in cash. *Id.,* at ¶ 10. Formal offers, however, never materialized, as a title search run on the property on or about January 12, 2024, revealed the existence of Financing Statement and Lafayette's lien on the Property. A copy of the title search results are attached hereto as Exhibit 8; *Id.,* at ¶ 11.

On or about February 16, 2024, Resolve mailed a demand letter (the "Demand Letter") to Silverman: 1) explaining that Lafayette's filing of the Financing Statement constituted a violation of the Automatic Stay; 2) explaining that Debtor had suffered financial harm due to the Lafayette's violation; and 3) making a reasonable offer to settle Debtor's automatic stay

violation claim informally. The Demand Letter included a copy of the BNC Notice of Bankruptcy Case Filing. A copy of the Demand Letter is attached hereto as Exhibit 9.

Upon information and belief, on or about February 21, 2024, Silverman filed a UCC-1 Financing Statement Amendment (the "Amendment") terminating Lafayette's lien on the Property. A copy of the Amendment is attached hereto as Exhibit 10. Despite taking action to terminate the lien, however, Silverman failed to provide either Debtor or Resolve with a copy of the Amendment, despite repeated requests by both Debtor and Resolve. *See* Debtor's Declaration, ¶¶ 13-14. Silverman also failed to respond to Resolve's offer to settle Debtor's automatic stay violation claim informally.

It was crucial that Debtor be provided with a copy of the Amendment as immediately as possible, as without one, Debtor could not demonstrate to potential buyers that Lafayette's lien on the Property was void, and had been terminated. Consequently, without any confirmation from Lafayette and/or Silverman that the lien had been terminated, Debtor refrained from affirmatively marketing the property, as they had no way of knowing if the lien had actually been terminated or not. This caused Debtor and Mr. Adler a great deal of stress, as they were desperate to sell the Property and move to the east coast, in order to help care for their elderly relatives in ailing health. *See* Debtor's Declaration, ¶¶ 21-23.

On or about March 1, 2025, Resolve emailed Silverman, explicitly requesting a copy of the Amendment, but Resolve received no response. A copy of Resolve's March 1, 2025 correspondence is attached hereto as Exhibit 11.

Additionally, on multiple occasions throughout February 2024 and March 2024, Debtor called and emailed Silverman requesting a copy of the filed Amendment, but was ignored. *See* Debtor's Declaration, ¶ 13.

In or around March 2024, Debtor and Mr. Adler received interest in the Property from a potential purchaser, and entertained the offer, even though they were still unsure if the termination of Lafayette's lien had been processed. *See* Debtor's Declaration, ¶ 15. Fortunately, Lafayette's lien no longer appeared when another title search was run on the Property by the prospective buyer, allowing Debtor and Debtor's husband to accept an offer of sale on or about March 24, 2024. *Id.,* at ¶ 16. Unfortunately, the offer accepted was significantly lower than the offer Debtor and Debtor's husband were willing to accept back in February 2024. The Property sold for $925,000, on the condition that Debtor and Debtor's husband be responsible for paying off the $20,000 remaining on the lease for the Property's solar power installation. *Id.,* at ¶ 17

Furthermore, the delay in being able to sell the Property forced Debtor to incur additional expenses associated with the Property between January 2024 and March 2024, including property taxes, home insurance, and mortgage interest, per the terms of the mortgage agreement relating to the Property. *See* Debtor's Declaration, ¶ 19. Specifically, for each month the sale of the Property was delayed due to Lafayette's violation, Debtor was responsible for paying: 1) $613.71 in property taxes; 2) $252.25 in home insurance; and 3) ~$1,100 in mortgage insurance. A copy of Debtor's March 2024 and April 2024 mortgage statements is attached hereto as Exhibit 12.

On or about March 26, 2024 – more than a month after the Amendment was actually filed and past the point of it being useful to Debtor in the efforts to sell the Property quickly – Silverman finally provided Debtor with a copy of the Amendment. *See* Debtor's Declaration, ¶ 17.

On or about September 5, 2024, Debtor's newly-retained litigation counsel sent correspondence to Silverman in an attempt to resolve Debtor's automatic stay violation claim. A

copy of the September 5, 2024 correspondence is attached hereto as Exhibit 13. On or about September 25, 2024, Silverman responded, denying liability. On or about September 30, 2024, Debtor's litigation counsel responded to the September 25, 2024 correspondence further detailing Lafayette's liability for violating the Automatic Stay and re-extending an offer to resolve Debtor's claim informally, but received no response, resulting in the filing of the immediate motion.

## ARGUMENT

**A. Lafayette is Liable for Violating the Automatic Stay**

    a. Overview.

As noted above, bankruptcy courts have authority to award damages and impose civil contempt sanctions against a creditor who willfully violates the automatic stay 11 U.S.C. § 362(k). The Court must therefore examine whether: 1) Lafayette violated the Automatic Stay; and 2) any such violation was "willful."

    b. Lafayette Violated the Automatic Stay.

A bankruptcy petition "operates as a stay" against, *inter alia,*

> any act to create, perfect, or enforce any lien against property of the estate," and "any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title."

11 U.S.C. §§ 362(a)(4), (5).[1] In this case, the Automatic Stay arose when Debtor filed his bankruptcy petition on April 20, 2023. Because Lafayette subsequently took an act to perfect a

---

[1] Property of the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." *See* 11 U.S.C. § 541(a)(1). Debtor has a legal and possessory interest in the Property and as sch, the Property is property of the bankruptcy estate. Alternatively, the Property is property of the Debtor.

7

lien against the Property by filing the Financing Statement on May 1, 2023, it clearly violated the Automatic Stay. *See In re Parker*, 644 B.R. 805, 825 (N.D. Cal. 2021) ("The automatic stay bars any act to perfect a lien to secure a claim that arose pre-petition against the property of the debtor."); *Ali v. Merch. (In re Ali)*, 2015 Bankr. LEXIS 2443, at *187 (Bankr. W.D. Tex. July 23, 2015) (holding that a creditor's post-petition filings of UCC financing statements constituted "violations of the automatic stay under 11 U.S.C. §§ 362(a)(4) & (5)").

    c. <u>Lafayette's Violation was Willful</u>

With respect to the "willfulness" question, Debtor does not need to prove that Lafayette intended to violate the Automatic Stay. Rather, all Debtor needs to prove is that Lafayette: 1) was notified of Debtor's bankruptcy filing; and 2) intended its subject actions. *See Pinkstaff v. United States (In re Pinkstaff),* 974 F.3d 113, 115 (9th Cir. 1992).

Regarding the "notice" requirement, "[d]ue process does not require actual notice. Rather, it requires notice 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Nationstar Mortg. LLC v. Springs Prop. Owners Ass'n*, 309 F. Supp. 3d 868, 874 (D. Nev. 2018) (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950); *see also In re Harrell,* 325 B.R. 643, 648 (Bankr. M.D. Fla. 2005) ("Under the *Mullane* standard, the reasonableness and the constitutional validity of a chosen method of notice requires that the method be reasonably certain to inform those affected, but does not require the very best method of service of process. A creditor who challenges the accuracy of a listed address bears the burden of proving that the address used was so incorrect as to fall short of the threshold."); *Moody v. Bucknum (In re Bucknum)*, 951 F.2d 204, 207 (9th Cir.

1991) ("The mailing of a properly addressed and stamped item creates a rebuttable presumption that the addressee received it.").

　　　　In this case, the BNC sent notice of Debtor's bankruptcy filing to Lafayette at the correct address for the Lafayette branch location in Rockville, Maryland. Sending notice to a physical location where Lafayette operates business out of is clearly "reasonably calculated" to apprise Lafayette of Debtor's bankruptcy. *See In re Hernandez,* No. 2:12-bk-47099-RK Chapter 7, 2017 Bankr. LEXIS 4150, at *13 (Bankr. C.D. Cal. Dec. 5, 2017) ("Courts have found that generally 'mailing a notice to a party's last-known address is 'reasonably calculated' to provide actual notice."); *see also In re Stringer,* 586 B.R. 435, 439 (Bankr. S.D. Ohio 2018) (holding that there is "no dispute" that the creditor received notice of the debtor's bankruptcy as the "company's correct address was listed" in the mailing matrix filed with the Court).

　　　　Here, after receiving notice of Debtor's April 20, 2023 bankruptcy petition and the resultant automatic stay from the BNC via certified mail on or about April 26, 2023, Lafayette affirmatively filed the Financing Statement on May 1, 2023. Because Lafayette obviously intended to file the Financing Statement, Lafayette cannot seriously dispute that its Automatic Stay violation was "willful." *See In re Ozenne,* 337 B.R. 214, 220 (B.A.P. 9th Cir. 2006) (holding that knowledge of the bankruptcy filing is the legal equivalent of knowledge of the automatic stay).

**B. <u>Debtor Should be Awarded Actual Damages</u>**

　　　　Appropriate civil contempt sanctions for an automatic stay may include a damages award for emotional distress. *Dawson v. Washington Mut. Bank (In re Dawson),* 390 F.3d 1139, 1151 (9th Cir. 2004); *In re Masi*, 2005 Bankr. LEXIS 3005, at *10 (Bankr. D. Idaho May 24, 2005)

("An award of actual damages is mandatory if a debtor proves both that a willful violation occurred and that the debtor suffered some injury as a result.").

To recover such damages, a debtor must "(1) suffer significant harm, (2) clearly establish the significant harm, and (3) demonstrate a causal connection between that significant harm and the violation …" *Dawson,* 390 F.3d at 1151. These elements may be proved with corroborating testimony or, alternatively, shown in light of "egregious conduct" by the bankruptcy law violator or circumstances that "make it obvious that a reasonable person would suffer significant emotional harm." *Id; see also In re White,* 2007 Bankr. LEXIS 2354, at *17-18 (Bankr. D. Ariz. July 9, 2007) ("Actual injury and harm include emotional distress suffered by a debtor, and a Court may award emotional distress damages without requiring the debtor to present medical affidavits or receipts.").

In this case, Lafayette's Automatic Stay violation caused Debtor not only to lose out on an attractive offer for the Property, but significant emotional distress due to the delay in moving Debtor and Debtor's family suffered as a result. Instead of being able to sell the Property in or around January 2024, Debtor was forced to wait until: 1) Lafayette took action to terminate the lien; and 2) the processing of the Amendment, resulting in the removal of the lien when a title search is ran. Lafayette's actions in terminating the lien, and Lafayette's agents' (Silverman) actions in failing to provide Debtor with confirmation and/or evidence of the Amendment resulted in: 1) the loss of an attractive offer in or around January 2024; and 2) forcing Debtor and his family to delay their plans to move until late March 2024, when the lien termination was processed and the sale of the Property effectuated. *See In re McLaughlin,* 2007 Bankr. LEXIS 3857, at *22 (Bankr. D. Ariz. Oct. 30, 2007) (awarding $6,000 in emotional distress damages for creditor's violation of the automatic stay); *see also Snowden v. Check into Cash of Wash., Inc.*

*(In re Snowden),* 769 F.3d 651, 657 (9th Cir. 2014) (affirming an award of $12,000 in emotional distress damages for creditor's violation of the automatic stay); *America's Servicing Co. v. Schwartz-Tallard*, 438 B.R. 313, 323 (D. Nev. 2010) (affirming an award of $40,000 in emotional distress damages for creditor's violation of the automatic stay); *Sillman v. Walker (In re Sillman)*, Nos. 09-22188-E-13, 12-2023, 2014 Bankr. LEXIS 292, at *40 (Bankr. E.D. Cal. Jan. 21, 2014) (awarding $14,000 in emotional distress damages for creditor's violation of the automatic stay); *In re Bradford*, Nos. 18-25405-B-7, PLC-1, 2018 Bankr. LEXIS 3871, at *23 (Bankr. E.D. Cal. Dec. 4, 2018) (awarding $5,000 in emotional distress damages for creditor's violation of the automatic stay); *In re Breul*, 533 B.R. 782, 797 (Bankr. C.D. Cal. 2015) (awarding $5,000 in emotional distress damages for creditor's violation of the automatic stay).

Furthermore, for each month the sale of the Property was delayed due to Lafayette's violation of the Automatic Stay, Debtor incurred costs associated with owning the Property, such as the aforementioned property taxes, homeowner's insurance and mortgage interest. In February 2024, Debtor paid $613.71 in property taxes, $252.25 in homeowner's insurance, and $1101.08 in mortgage interest, or $1,967.04 total. *See* Debtor's Declaration, ¶ 19; Exhibit 12. In March 2024, Debtor paid $613.71 in property taxes, $252.25 in homeowner's insurance, and $1098.87 in mortgage interest, or $1,964.83 total. *Id.* In April 2024, Debtor paid $613.71 in property taxes, $252.25 in homeowner's insurance and $1,103.29 in mortgage interest, or $1,969.25 total. *Id.* All in all then, between February 2024 and April 2024, Debtor incurred a total of $5,901.12 in costs associated with the Property that Debtor would not have had to pay had Lafayette's Financing Statement not prevented Debtor from selling the Property in January 2024.

## C. Debtor Should be Awarded Attorney's Fees and Costs

Attorneys' fees are awardable to remedy violations of an automatic stay. 11 U.S.C. § 362(k); *in re Dyer,* 322 F.3d 1178, 1195 (9th Cir. 2003). As one leading commentator has noted, the policy underlying awards of attorneys' fees to remedy bankruptcy violations is for good reason:

> The failure to award attorney's fees would leave a debtor who litigated to remedy a violation worse off than if the injunction had not been violated and would discourage vindication of the discharge.

4 Collier on Bankruptcy ¶ 524.02[c]

To date, Debtor has incurred substantial attorneys' fees and costs related to his claim to redress Lafayette's bankruptcy law violations. The fees encompass attorney time spent: a) undertaking an investigation of Debtor's claims; b) preparing pre-litigation correspondence to Lafayette; and c) the preparation of this Motion and related papers. Debtor's attorneys' fees and costs should be awarded here as well.[2]

---

[2] Debtor's counsel will provide itemized time entries for attorneys' fees/costs upon request.

**CONCLUSION**

For the foregoing reasons, the Court should find that Lafayette willfully violated the Automatic Stay in this matter. Pursuant to 11 U.S.C. §§ 362(k) and 105, the Court should further award Debtor actual damages, including his emotional distress damages, caused by Lafayette's violations of the Automatic Stay in this proceeding, plus Debtor's reasonable attorneys' fees and costs incurred.

Dated: March 24, 2025

*/s/ Jenna Dakroub*
Jenna Dakroub, CA # 350170
**CONSUMER ATTORNEYS**
16130 Ventura Blvd., Suite 300
Encino, CA 91316
T: (602) 807-1525
F: (718) 715-1750
E: jdakroub@consumerjustice.com

*Attorneys for Debtor*
*Joshua Scott Miller*