14
Landon T. Maxwell, AZ #038439
**CONSUMER JUSTICE LAW FIRM PLC**
8095 N. 85th Way
Scottsdale, AZ 85258
T: (480) 626-1975
F: (480) 613-7733
E: lmaxwell@consumerjustice.com

Jenna Dakroub, CA # 350170
**CONSUMER JUSTICE LAW FIRM PLC**
16130 Ventura Blvd., Suite 300
Encino, CA 91316
T: (602) 807-1525
F: (480) 613-7733
E: jdakroub@consumerjustice.com

*Attorneys for Debtor*
*Joshua Scott Miller*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**MODESTO DIVISION**

| | |
|---|---|
| In re:<br><br>JOSHUA SCOTT MILLER<br><br>        Debtor, | Case No.: 23-90171-E<br>Docket Control: CJL-3<br><br>Chapter 7<br><br>**MOTION FOR CONTEMPT AND DAMAGES FOR VIOLATION OF THE AUTOMATIC STAY**<br><br>Date: August 7, 2025<br>Time: 10:30 am. PST<br>Courtroom: Modesto Division 1200 I Street, Suite 200, Modesto, California<br><br>Hon. Ronald H. Sargis |

**MOTION FOR CONTEMPT AND DAMAGES FOR VIOLATION**
**OF THE AUTOMATIC STAY**

1

Debtor, Joshua Scott Miller, ("Debtor") seeks redress for the unlawful and intentional practices committed by Lafayette Federal Credit Union ("Lafayette") in connection with its actions taken in violation of the Automatic Stay. Debtor seeks monetary relief pursuant to 11 U.S.C. § 362, and damages, both compensatory and punitive, plus all reasonable attorneys' fees and costs incurred in bringing this action, sanctions, and such other relief the Court deems appropriate. Debtor files this motion pursuant to the Court's May 1, 2025 Order. [Doc. 60] and May 2, 2025 Order [Doc. 62]. In support of this Motion, Debtor alleges as follows:

The Petition seeking relief under Chapter 7 of Title 11 of the United States Bankruptcy Code was filed on April 20, 2023. The case was re-opened by order of this Court on March 19, 2025, order [Doc. 31].

After Debtor filed his Chapter 7 petition and while the automatic stay was in place, Lafayette filed a UCC-1 Financing Statement ("File No. 2023-003115) (the "Financing Statement") in order to perfect Lafayette's security interest in Debtor's inground pool at his residence (the "Property").

Lafayette's action in filing the Financing Statement caused Debtor harm by essentially rendering Debtor unable to sell the Property until the Financing Statement was terminated, delaying Debtor and his family from moving for several months. These damages are recoverable pursuant to Title 11 of the United States Code section 362(k)(1).

**JURISDICTION AND VENUE**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157 because this matter relates to this Court's power to enforce the Stay imposed in this case under 11 U.S.C. § 362. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**STATEMENT OF GROUNDS**

In or around February 2021, Debtor applied for, and received, a personal loan from Lafayette. As collateral, Lafayette obtained a security interest in an inground pool at Debtor's residence in Valley Springs, California (the "Property"). A copy of the loan agreement between Debtor and Lafayette is attached hereto as Exhibit 3.

Having fallen on hard financial times, on or about April 20, 2023, Debtor filed for Chapter 7 Bankruptcy. Lafayette was listed as a creditor in Schedules E/F of Debtor's Chapter 7 bankruptcy petition and was included on the Master Creditor Matrix. A copy of Debtor's Chapter 7 bankruptcy petition is attached hereto as Exhibit 4.

On or about April 26, 2023, the Bankruptcy Noticing Center ("BNC") mailed notice of Debtor's bankruptcy petition, and the resultant Automatic Stay, to Lafayette, at the business address for the Rockville, MD Lafayette branch location. A copy of the BNC Certificate of Notice is attached hereto as Exhibit 5.

Unbeknownst to Debtor, on or about May 1, 2023, Lafayette, through their counsel Silverman Theologou, LLP ("ST"), filed a UCC-1 Financing Statement ("File No. 2023-003115) (the "Financing Statement") in an attempt to perfect Lafayette's security interest in the Property. A copy of the Financing Statement is attached hereto as Exhibit 6.

Thereafter, on or about July 24, 2023, Debtor received a Chapter 7 bankruptcy discharge, and the bankruptcy case was closed on or about November 3, 2023. A copy of Debtor's Chapter 7 Discharge Order is attached hereto as Exhibit 7.

In or around November 2023, around Thanksgiving, Debtor and Debtor's husband decided to relocate their family from California to the east coast, in order to be closer to relatives living in Tennessee and Georgia. Debtor and his family were highly motivated to relocate to the

east coast, as Debtor wished for his young son to meet his great grandfather, who was ninety-one years of age and in ailing health, for the first time. *See* Declaration of Debtor, attached hereto as Exhibit 1, at ¶ 5. As Debtor's bankruptcy case had just recently closed, Debtor, on or about November 27, 2023, emailed his bankruptcy attorneys at Resolve Law Group ("Resolve") and asked if there were any restrictions on selling the Property due to the bankruptcy case, or if Debtor was free to sell the Property and move to the east coast. *Id.,* at ¶ 6. Resolve responded to Debtor, accurately informing him that he was free to sell the Property at any time he wished, given that the bankruptcy case was closed. *Id.,* at ¶ 7.

Consequently, in January, 2024, Debtor listed the Property for sale. *Id.,* at ¶ 8. Because Debtor's husband, Steven Adler ("Mr. Adler"), is a licensed real estate agent, Debtor and Debtor's husband listed the Property for sale themselves, without utilizing outside real estate agent services. *Id.,* at ¶ 9. Almost immediately after the Property was listed, Debtor began to receive strong interest from potential buyers. *Id.,* at ¶ 10. Formal offers, however, never materialized, as a title search run on the property on or about January 12, 2024, revealed the existence of Financing Statement and Lafayette's lien on the Property. A copy of the title search results are attached hereto as Exhibit 2; *Id.,* at ¶ 11.

On or about February 16, 2024, Resolve mailed a demand letter (the "Demand Letter") to Silverman: 1) explaining that Lafayette's filing of the Financing Statement constituted a violation of the Automatic Stay; 2) explaining that Debtor had suffered financial harm due to the Lafayette's violation; and 3) making a reasonable offer to settle Debtor's automatic stay violation claim informally. The Demand Letter included a copy of the BNC Notice of Bankruptcy Case Filing. A copy of the Demand Letter is attached hereto as Exhibit 8.

Upon information and belief, on or about February 21, 2024, Silverman filed a UCC-1 Financing Statement Amendment (the "Amendment") terminating Lafayette's lien on the Property. A copy of the Amendment is attached hereto as Exhibit 9. Despite taking action to terminate the lien, however, Silverman failed to provide either Debtor or Resolve with a copy of the Amendment, despite repeated requests by both Debtor and Resolve. *See* Debtor's Declaration, ¶¶ 13-14. Silverman also failed to respond to Resolve's offer to settle Debtor's automatic stay violation claim informally.

It was crucial that Debtor be provided with a copy of the Amendment as immediately as possible, as without one, Debtor could not demonstrate to potential buyers that Lafayette's lien on the Property was void, and had been terminated. Consequently, without any confirmation from Lafayette and/or Silverman that the lien had been terminated, Debtor refrained from affirmatively marketing the property, as they had no way of knowing if the lien had actually been terminated or not. This caused Debtor and Mr. Adler a great deal of stress, as they were desperate to sell the Property and move to the east coast, in order to help care for their elderly relatives in ailing health. *See* Debtor's Declaration, ¶¶ 18-21.

On or about March 1, 2025, Resolve emailed Silverman, explicitly requesting a copy of the Amendment, but Resolve received no response. A copy of Resolve's March 1, 2025 correspondence is attached hereto as Exhibit 10.

Additionally, on multiple occasions throughout February 2024 and March 2024, Debtor called and emailed Silverman requesting a copy of the filed Amendment, but was ignored. *See* Debtor's Declaration, ¶ 13.

In or around March 2024, Debtor and Mr. Adler received interest in the Property from a potential purchaser, and entertained the offer, even though they were still unsure if the

termination of Lafayette's lien had been processed. *See* Debtor's Declaration, ¶ 14. Fortunately, Lafayette's lien no longer appeared when another title search was run on the Property by the prospective buyer, allowing Debtor and Debtor's husband to accept an offer of sale on or about March 24, 2024. *Id.,* at ¶¶ 15-16.

On or about March 26, 2024 – more than a month after the Amendment was actually filed and past the point of it being useful to Debtor in the efforts to sell the Property quickly – Silverman finally provided Debtor with a copy of the Amendment. *See* Debtor's Declaration, ¶ 17.

On or about September 5, 2024, Debtor's newly-retained litigation counsel sent correspondence to Silverman in an attempt to resolve Debtor's automatic stay violation claim. A copy of the September 5, 2024 correspondence is attached hereto as Exhibit 11. On or about September 25, 2024, Silverman responded, denying liability. On or about September 30, 2024, Debtor's litigation counsel responded to the September 25, 2024 correspondence further detailing Lafayette's liability for violating the Automatic Stay and re-extending an offer to resolve Debtor's claim informally. Debtor filed a motion alleging violation of the automatic stay on March 26, 2023. [Doc. 50]. Following a hearing on the matter held on May 1, 2025, the Court entered an Order dismissing Debtor's motion without prejudice, in order to allow Debtor and Lafayette an opportunity to resolve the matter themselves. [Doc. 62]. Debtor and Lafayette were thereafter unable to resolve the matter between them, resulting in the filing of the immediate Motion.

//

## ARGUMENT

**A. Lafayette is Liable for Violating the Automatic Stay**

    a. <u>Overview.</u>

As noted above, bankruptcy courts have authority to award damages and impose civil contempt sanctions against a creditor who willfully violates the automatic stay 11 U.S.C. § 362(k). The Court must therefore examine whether: 1) Lafayette violated the Automatic Stay; and 2) any such violation was "willful."

    b. <u>Lafayette Violated the Automatic Stay.</u>

A bankruptcy petition "operates as a stay" against, *inter alia,*

> any act to create, perfect, or enforce any lien against property of the estate," and "any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title."

11 U.S.C. §§ 362(a)(4), (5).[1] In this case, the Automatic Stay arose when Debtor filed his bankruptcy petition on April 20, 2023. Because Lafayette subsequently took an act to perfect a lien against the Property by filing the Financing Statement on May 1, 2023, it clearly violated the Automatic Stay. *See In re Parker*, 644 B.R. 805, 825 (N.D. Cal. 2021) ("The automatic stay bars any act to perfect a lien to secure a claim that arose pre-petition against the property of the debtor."); *Ali v. Merch. (In re Ali)*, 2015 Bankr. LEXIS 2443, at *187 (Bankr. W.D. Tex. July 23, 2015) (holding that a creditor's post-petition filings of UCC financing statements constituted "violations of the automatic stay under 11 U.S.C. §§ 362(a)(4) & (5)").

---

[1] Property of the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." *See* 11 U.S.C. § 541(a)(1). Debtor has a legal and possessory interest in the Property and as sch, the Property is property of the bankruptcy estate. Alternatively, the Property is property of the Debtor.

Moreover, following the filing of the Financing Statement, Lafayette had an affirmative duty to thereafter release the lien on Debtor's property. "Congress and the Ninth Circuit Court of Appeals have made it clear that a violation of the automatic stay is a very serious matter. A creditor who violates the stay has an affirmative obligation to correct the violation and cannot assert a defense based on the lack of action by a debtor to force the remedy of that creditor's violation." *Achterberg v. Creditors Trade Ass'n (In re Achterberg),* 573 B.R. 819, 829 (Bankr. E.D. Cal. 2017). Lafayette, however, failed to take any affirmative action whatsoever, only terminating the lien in February 2024, after an explicit request from Debtor's bankruptcy counsel.

    c.   <u>Lafayette's Violation was Willful</u>

With respect to the "willfulness" question, Debtor does not need to prove that Lafayette intended to violate the Automatic Stay. Rather, all Debtor needs to prove is that Lafayette: 1) was notified of Debtor's bankruptcy filing; and 2) intended its subject actions. *See Pinkstaff v. United States (In re Pinkstaff),* 974 F.3d 113, 115 (9th Cir. 1992).

Regarding the "notice" requirement, "[d]ue process does not require actual notice. Rather, it requires notice 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Nationstar Mortg. LLC v. Springs Prop. Owners Ass'n*, 309 F. Supp. 3d 868, 874 (D. Nev. 2018) (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950); *see also In re Harrell,* 325 B.R. 643, 648 (Bankr. M.D. Fla. 2005) ("Under the *Mullane* standard, the reasonableness and the constitutional validity of a chosen method of notice requires that the method be reasonably certain to inform those affected, but does not require the very best method of service of process. A creditor who challenges the accuracy of a listed address bears the burden of proving that the address used was so incorrect as to fall short of the

threshold."); *Moody v. Bucknum (In re Bucknum)*, 951 F.2d 204, 207 (9th Cir. 1991) ("The mailing of a properly addressed and stamped item creates a rebuttable presumption that the addressee received it.").

In this case, the BNC sent notice of Debtor's bankruptcy filing to Lafayette at the correct address for the Lafayette branch location in Rockville, Maryland. Sending notice to a physical location where Lafayette operates business out of is clearly "reasonably calculated" to apprise Lafayette of Debtor's bankruptcy. *See In re Hernandez,* No. 2:12-bk-47099-RK Chapter 7, 2017 Bankr. LEXIS 4150, at *13 (Bankr. C.D. Cal. Dec. 5, 2017) ("Courts have found that generally 'mailing a notice to a party's last-known address is 'reasonably calculated' to provide actual notice."); *see also In re Stringer,* 586 B.R. 435, 439 (Bankr. S.D. Ohio 2018) (holding that there is "no dispute" that the creditor received notice of the debtor's bankruptcy as the "company's correct address was listed" in the mailing matrix filed with the Court).

As further confirmation that the Rockville, Maryland branch addressed used by the BNC was "reasonably calculated" to apprise Lafayette, Lafayette in fact received a copy of Debtor's Discharge Order, which was mailed by the BNC to the same Rockville, Maryland branch address. [Doc. 50, p. 3]. By all standards, Debtor met his burden of establishing proper notice of his bankruptcy case via the April 26, 2023 BNC notice. *See In re Savage,* 167 B.R. 22, 26 (Bankr. S.D.N.Y. 1994) ("Neither the statute nor the rules state that the creditor be listed at a particular address . . . there is no requirement that a corporate creditor be listed at its home office or principal place of business."); *In re march FIRST, Inc.,* 345 B.R. 866, 869 (Bankr. N.D. Ill. 2006) ("When notice is mailed to the address from which a corporate creditor conducted business with a debtor, notice of a bar date is reasonable and sufficient.

Clearly, Lafayette has systems in place to ensure that correspondence mailed to an individual branch location be re-routed to the preferred Tower Oaks Blvd address. Despite receiving notice of Debtor's bankruptcy petition and the resultant automatic stay from the BNC on or about April 26, 2023, however, Lafayette affirmatively filed the Financing Statement on May 1, 2023. Because Lafayette obviously intended to file the Financing Statement, Lafayette cannot seriously dispute that its Automatic Stay violation was "willful." *See In re Ozenne,* 337 B.R. 214, 220 (B.A.P. 9th Cir. 2006) (holding that knowledge of the bankruptcy filing is the legal equivalent of knowledge of the automatic stay).

Alternatively, if the Court determines that Lafayette did not have notice of Debtor's bankruptcy case at the time Lafayette filed the Financing Statement, Lafayette is nevertheless liable for a willful violation for failing to thereafter take action to terminate the lien following receipt of Debtor's Discharge Order from the BNC on or about August 2, 2023. Despite having notice of Debtor's bankruptcy case no later than August 2, 2023, Lafayette took no action to remedy its violation for six months (August 2023 – February 2024), despite its clear duty to have taken remedial action. *See Achterberg*, 573 B.R. at *830-31 ("The automatic stay imposes an affirmative duty of compliance by the creditor . . . 'the automatic stay requires a creditor to maintain the *status quo ante* and to remediate acts taken in ignorance of the stay.'") (internal citation omitted). Moreover, Lafayette was obligated to take action unprompted, and should not have waited until specifically asked to do so by Debtor. *Id.,* at *830 ("The automatic stay is just that, automatic . . . [w]hen a creditor has notice of a bankruptcy case, it is the creditor's burden to determine the extent of the automatic stay and seek such relief as is appropriate.").

In any event, Lafayette committed a willful violation. If Lafayette had notice of Debtor's bankruptcy case in April 2023, than the filing of the Financing Statement was an intentional act

taken in violation of the stay. And if Lafayette did not have notice of Debtor's bankruptcy case until August 2023, it still intentionally refused to remedy its violation by taking timely action to release the lien. Either way, Lafayette's violation of the automatic stay was willful. *Achterberg*, 573 B.R. at *831 ("Once the creditor learns or has notice of a bankruptcy case having been filed, any actions that it intentionally undertakes are deemed willful.").

### B. Debtor Should be Awarded Actual Damages

Appropriate civil contempt sanctions for an automatic stay may include a damages award for emotional distress. *Dawson v. Washington Mut. Bank (In re Dawson),* 390 F.3d 1139, 1151 (9th Cir. 2004); *In re Masi*, 2005 Bankr. LEXIS 3005, at *10 (Bankr. D. Idaho May 24, 2005) ("An award of actual damages is mandatory if a debtor proves both that a willful violation occurred and that the debtor suffered some injury as a result.").

To recover such damages, a debtor must "(1) suffer significant harm, (2) clearly establish the significant harm, and (3) demonstrate a causal connection between that significant harm and the violation …" *Dawson,* 390 F.3d at 1151. These elements may be proved with corroborating testimony or, alternatively, shown in light of "egregious conduct" by the bankruptcy law violator or circumstances that "make it obvious that a reasonable person would suffer significant emotional harm." *Id; see also In re White,* 2007 Bankr. LEXIS 2354, at *17-18 (Bankr. D. Ariz. July 9, 2007) ("Actual injury and harm include emotional distress suffered by a debtor, and a Court may award emotional distress damages without requiring the debtor to present medical affidavits or receipts.").

In this case, Lafayette's Automatic Stay violation caused significant emotional distress due to the delay in moving Debtor and Debtor's family suffered as a result. Instead of being able to sell the Property in or around January 2024, Debtor was forced to wait until: 1) Lafayette took

11

action to terminate the lien; and 2) the processing of the Amendment, resulting in the removal of the lien when a title search is ran. Lafayette's actions in terminating the lien, and Lafayette's agents' (Silverman) actions in failing to provide Debtor with confirmation and/or evidence of the Amendment forced Debtor and his family to delay their plans to move until late March 2024, when the lien termination was processed and the sale of the Property effectuated. *See In re McLaughlin,* 2007 Bankr. LEXIS 3857, at *22 (Bankr. D. Ariz. Oct. 30, 2007) (awarding $6,000 in emotional distress damages for creditor's violation of the automatic stay); *see also Snowden v. Check into Cash of Wash., Inc. (In re Snowden),* 769 F.3d 651, 657 (9th Cir. 2014) (affirming an award of $12,000 in emotional distress damages for creditor's violation of the automatic stay); *America's Servicing Co. v. Schwartz-Tallard*, 438 B.R. 313, 323 (D. Nev. 2010) (affirming an award of $40,000 in emotional distress damages for creditor's violation of the automatic stay); *Sillman v. Walker (In re Sillman)*, Nos. 09-22188-E-13, 12-2023, 2014 Bankr. LEXIS 292, at *40 (Bankr. E.D. Cal. Jan. 21, 2014) (awarding $14,000 in emotional distress damages for creditor's violation of the automatic stay); *In re Bradford*, Nos. 18-25405-B-7, PLC-1, 2018 Bankr. LEXIS 3871, at *23 (Bankr. E.D. Cal. Dec. 4, 2018) (awarding $5,000 in emotional distress damages for creditor's violation of the automatic stay); *In re Breul*, 533 B.R. 782, 797 (Bankr. C.D. Cal. 2015) (awarding $5,000 in emotional distress damages for creditor's violation of the automatic stay).

As detailed in Debtor's declaration, filed concurrently herewith, the several-month long delay was more than a mere inconvenience, but caused severe distress to Debtor and his husband, whose motivation for selling the Property was due to their desire to move closer to extended family, who were in ailing health. The lien unquestionably acted as an obstacle to the sale of the Property, and the resultant delay caused Debtor to spend several months living in stress, anxiety and frustration, instead of being able to spend that time near family. More than the inherent stress

and annoyance of having a move being delayed, and living in limbo for several months, Debtor and his family, including his young son, was robbed of several months of precious time that could have been spent with family, but was instead spent stressing over the logistics of Lafayette's lien. As further detailed in Debtor's declaration, Debtor received no update or notification from Lafayette, or Lafayette's counsel, regarding the steps taking to terminate the lien whatsoever until *after* Debtor had already sold the Property. Debtor got "lucky" that Lafayette did take action to terminate the lien, allowing them to sell the Property in late March 2024, but without confirmation from Lafayette as to that action taken, Debtor was in the dark, and spent many sleepless nights wondering if the lien was being removed, or if their move would be delayed even longer.

Debtor suffered significant emotional distress, and such distress was a direct consequence of Lafayette's violation. Debtor should be awarded emotional distress damages.

### C. **Debtor Should be Awarded Attorney's Fees and Costs**

Attorneys' fees are awardable to remedy violations of an automatic stay. 11 U.S.C. § 362(k); *in re Dyer,* 322 F.3d 1178, 1195 (9th Cir. 2003). As one leading commentator has noted, the policy underlying awards of attorneys' fees to remedy bankruptcy violations is for good reason:

> The failure to award attorney's fees would leave a debtor who litigated to remedy a violation worse off than if the injunction had not been violated and would discourage vindication of the discharge.

4 Collier on Bankruptcy ¶ 524.02[c]

To date, Debtor has incurred substantial attorneys' fees and costs related to his claim to redress Lafayette's bankruptcy law violations. The fees encompass attorney time spent: a) undertaking an investigation of Debtor's claims; b) preparing pre-litigation correspondence to

Lafayette; and c) the preparation of this Motion and related papers. Debtor's attorneys' fees and costs should be awarded here as well.[2]

## CONCLUSION

For the foregoing reasons, the Court should find that Lafayette willfully violated the Automatic Stay in this matter. Pursuant to 11 U.S.C. §§ 362(k) and 105, the Court should further award Debtor actual damages, including his emotional distress damages, caused by Lafayette's violations of the Automatic Stay in this proceeding, plus Debtor's reasonable attorneys' fees and costs incurred.

Dated: June 15, 2025
　　　　　　　　　　　　　　　　　　*/s/Landon T. Maxwell*
　　　　　　　　　　　　　　　　　　Landon T. Maxwell, AZ #038439
　　　　　　　　　　　　　　　　　　CONSUMER JUSTICE LAW FIRM PLC
　　　　　　　　　　　　　　　　　　8095 N. 85th Way
　　　　　　　　　　　　　　　　　　Scottsdale, AZ 85258
　　　　　　　　　　　　　　　　　　T: (480) 626-1975
　　　　　　　　　　　　　　　　　　F: (480) 613-7733
　　　　　　　　　　　　　　　　　　E: lmaxwell@consumerjustice.com

"　　　　　　　　　　　　　　　　　Jenna Dakroub, CA # 350170
　　　　　　　　　　　　　　　　　　**CONSUMER JUSTICE LAW FIRM PLC**
　　　　　　　　　　　　　　　　　　16130 Ventura Blvd., Suite 300
　　　　　　　　　　　　　　　　　　Encino, CA 91316
　　　　　　　　　　　　　　　　　　T: (602) 807-1525
　　　　　　　　　　　　　　　　　　F: (480) 613-7733
　　　　　　　　　　　　　　　　　　E: jdakroub@consumerjustice.com

　　　　　　　　　　　　　　　　　　*Attorneys for Debtor*
　　　　　　　　　　　　　　　　　　*Joshua Scott Miller*

---

[2] Debtor's counsel will provide itemized time entries for attorneys' fees/costs upon request.