# EXHIBIT 1

Jenna Dakroub, CA #350170
**CONSUMER ATTORNEYS**
8245 N. 85th Way
Scottsdale, AZ 85258
T: (602) 807-1525
F: (718) 715-1750
E: jdakroub@consumerattorneys.com

*Attorneys for Debtor*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA
# MODESTO DIVISION

| | |
|---|---|
| In re:<br><br>JOSHUA SCOTT MILLER<br><br>　　　　Debtor, | Case No.: 23-90171-E<br>Docket Control: CA-1<br><br>Chapter 7<br><br>**DECLARATION OF JOSHUA SCOTT MILLER IN SUPPORT OF MOTION FOR CONTEMPT AND DAMAGES FOR VIOLATION OF THE AUTOMATIC STAY**<br><br>Date:<br>Time:<br>Courtroom:<br><br>Hon. Ronald H. Sargis |

　　　I, Joshua Scott Miller, hereby declare on penalty of perjury that the following is true and correct:

1

1. I am an adult person over the age of eighteen, competent to testify about the matters set forth herein. I make this declaration of my personal knowledge, as based on public records and as noted herein. As to matters stated upon information and belief, I believe them to be true. If called to testify to the facts set forth herein, I can and would do so.

2. I am the Debtor in this Chapter 7 proceeding, which was filed in good faith on April 20, 2023.

3. In or around February 2021, prior to the filing of my Chapter 7 petition, I received a loan from Lafayette Federal Credit Union ("Lafayette").

4. As collateral for the loan, Lafayette obtained a security interest in an inground pool at my home in Valley Springs, California.

5. After filing for bankruptcy protection and receiving my discharge, my husband and I decided we wished to put our house up for sale, as we wanted to relocate to the East Coast in order to be closer to, and care for, aging family members.

6. Prior to taking any action, on or about November 27, 2023, I emailed my bankruptcy attorney to confirm that there was nothing that would restrict us from listing and selling our home, following the bankruptcy discharge.

7. My bankruptcy attorney responded, stating that my bankruptcy case had been officially closed, and that we were completely free to move forward and sell the house.

8. So, in or around January 2024, we listed the house for sale, at an asking price of $955,000.

9. As my husband is a licensed real estate agent, we listed the house ourselves.

10. Almost immediately, we received an offer from a potential buyer, who wished to purchase the home by paying, in cash, at the listed asking price.

11. When the potential buyer performed a title search on the property, however, he backed out of the sale, as the title search revealed that Lafayette had a lien on the property.

12. Upon discovering the existence of the lien, my bankruptcy attorneys, in or around February 2024, contacted Lafayette's counsel demanding they take immediate action to terminate the lien. To my knowledge, my bankruptcy attorneys never received a response from Lafayette or their attorneys, despite multiple follow ups.

13. I personally also reached out to Lafayette's counsel via phone and email on multiple occasions in February 2024 and March 2024, but was ignored.

14. Every day that passed, the health of my extended family members grew worse and worse, and I grew more and more anxious, waiting for confirmation from Lafayette that they had taken action to terminate the lien. I had no idea if our messages to Lafayette were getting through, or if the waiting we were doing was in vain.

15. Eventually, after hearing nothing from Lafayette, we decided to roll the dice and try and sell the house again, on the off-chance that Lafayette had terminated the lien.

16. Luckily, a title search ran by a prospective buyer in late March 2024 did not reveal the lien, so we accepted an offer of sale on or about March 24, 2024.

17. It was only after this, on or about March 26, 2024, that I was provided with a copy of the termination filing by Silverman.

18. The entire situation was a nightmare. After learning about a lien that should not have existed in January 2024, it took three (3) months for Lafayette to provide us with the lien termination statement. Throughout that time, we had no way of knowing whether Lafayette was doing anything to terminate the lien or not.

19. For those entire three months, I spent every day anxious, fearing that the lien was still on the property, and that our move would be unfairly delayed even further. My husband and I were extremely stressed by the situation. We couldn't understand why the lien was there in the first place, and we couldn't understand

why Lafayette wasn't communicating with us. If we had been given a copy of the termination filing, we would have at least known that some action was taken. But we had no way of knowing that, and feared the worst.

20. A major motivation in us selling our house and moving was the fact that we wanted my son, who had never met his great grandfather, to have the opportunity to do so. My son's great grandfather was ninety-one years of age at the time, and in ailing health. We greatly worried that he would pass away while we were waiting for the lien to be removed, and spent many sleepless nights fearing that our son would be robbed of the opportunity to meet his great grandfather, and suffered great stress and anxiety wondering how we were going to be able to move closer to family, if we were unable to sell our house.

21. Every day our move was delayed caused a great deal of stress and anxiety, given our east coast relatives' rapidly ailing health. Even though my son fortunately was able to meet his great-grandfather, he was robbed of spending significant time with him, due to the delay in moving caused by the lien's existence. We had extremely interested potential purchasers immediately after initially listing the property in January 2024, but could not effectuate a sale until months later – months we should have been able to spend time with family, but were instead spent in a constant state of worry, fear and anxiety.

22. A true and correct copy of the title search Preliminary Report, dated January 12, 2024, is attached hereto as Exhibit 2.

//

Dated:                                         _(See Attached)_
                                             Joshua Scott Miller

22. A true and correct copy of the title search Preliminary Report, dated January 12, 2024, is attached hereto as Exhibit 2.

//

Dated: 6/13/2025

Joshua Scott Miller